Frank D. DeLONG, Jr., et al., Plaintiffs,

v.

LEMCO HOSIERY MILLS, INC.,
Defendant.

ADAMS–MILLIS CORPORATION, Bear
Brand Hosiery Company, James L.
Getaz, and Frank D. DeLong, Jr., Plaintiffs,

v.

SILVER–KNIT HOSIERY MILLS, INC.,
Melrose Hosiery Mills, Inc., Amos Hosiery Mills, Inc., Crown Hosiery Mills,
Inc., and Harriss & Covington Hosiery
Mills, Inc., Defendants.

Nos. C–148–G–60, C–161–G–60,
C–89–G–61.

United States District Court
M. D. North Carolina,
Greensboro Division.

Oct. 9, 1963.

Welch Jordan, Greensboro, N. C., and
James P. Burns and William L. Mathis,
Washington, D. C., for plaintiffs.

David Rabin and Arthur O. Cooke,
Greensboro, N. C., for defendants.

PREYER, District Judge.

This suit involves claims by plaintiffs
for infringement of three patents relating
to the closing of toes of men's hose and
ladies hosiery by seaming, and counterclaims by defendants for declarations
that such patents are invalid and are
not infringed.

The patents in suit are: Getaz Reissue
Patent No. 24,314 (a Reissue of Getaz
Patent No. 2,740,279); Ledwell Patent
No. 2,903,872; and Slane Patent No.
2,980,917. We find that the claims in
suit in the original Getaz Patent and its
Reissue are valid and are infringed. We
find that the Ledwell and Slane patents
are invalid and are not infringed.

The legal title to all the patents in
suit is held by the plaintiff Frank D.
DeLong, Jr., for the beneficial interests
of James L. Getaz, Bear Brand Hosiery
Company, and Adams-Millis Corporation,
parties to the so-called Getaz "Joint Venture Patent Committee." The defendants are North Carolina hosiery manufacturers.

The patents in suit deal with methods
of closing the toe openings of circular
knit hosiery. Except for short periods of
wartime emergencies, the closing of the
toe openings of better quality circular
knit hosiery had for some three quarters
of a century been achieved by a practice
known as "looping." This was accom-

plished through the use of a machine known as a "looping machine" or "looper".

A looping machine, such as operated in open court, embodies a large wheel-like dial, from the margin of which closely spaced pins, sometimes referred to as "points.", project outwardly. A looping operator places the needle loops in pairs, one from the instep side and one from the toe side of the toe opening, on individual pins. If, for example, the stocking was produced with two hundred needles in operation on the circular knitting machine, the looping operator must place one hundred pairs of needle loops, loop-by-loop, on the pins of the looper dial. The dial rotates to advance different portions of its periphery past the operator. After one sock or stocking has the loops on opposite sides of the toe opening impaled in pairs on individual pins on the looper dial, the operator places the loops of an additional stocking on pins disposed circumferentially of the dial. Each stocking with the loops along the looper line impaled in pairs on the pins of the looper dial moves past a trimming device which cuts away the so-called runoff, i. e., courses of extra fabric knitted beyond the looper line, usually leaving not more than one course above the loops on the pins of the dial, and then the stocking passes to and through a station where a looping needle carries a looping thread successively through each pair of impaled loops. The looping needle moves down a groove in each pin on which the pairs of needle loops have been impaled to insure that the looper thread will be centered in the interlinked needle loops on the instep side and toe side of the toe opening. The looped stocking is then removed from the pins of the looper dial and is ready for dyeing, boarding and finishing. The looping operation, which was demonstrated in open court, is tedious and slow, calling for considerable skill, and subjects the operator to excessive eyestrain.

Because of the difficulties inherent in the looping process, efforts had been made from time to time to sew toes closed on sewing machines, a process known as "seaming." The toes of some circular knit socks were sewed closed on sewing machines long prior to the making of the alleged inventions involved in this suit. During wartime emergency periods, the need for quantity production and the scarcity of labor made it impractical to rely on looping for closing the toes of socks. During times of peace, the high cost of looping frequently led producers to use sewing machines in the salvage operations carried out in attempts to recover something from the culls of their manufacturing processes, and in socks of poorer quality. This seaming process usually yielded a more pronounced ridge in the toe closure and was therefore regarded as inferior to the flatter toe closure obtained by the looping process. This litigation arises out of the extensive efforts carried on by many individuals in the the hosiery business to find an acceptable substitute for the laborious and costly looping operation in the production of first quality circular knit hosiery and to eliminate the objectionable ridge found in most early seaming.

## THE GETAZ PATENT

One of the men who was most active in seeking a solution was James L. Getaz. Mr. Getaz has forty years background in the hosiery industry and is the holder of numerous patents. He originally sought a successful commercial method for closing hosiery along the "looper line", that is, by a toe closure extending transversely of the foot of the stocking. After failing to accomplish this, he embarked on the development of a technique embodying a modification in the knitted structure of the circular knit stocking such as would provide in a specially tailored stocking, as it is produced on the knitting machine, a toe opening that could be closed by a seam extending longitudinally from the toe centrally of the bottom of the foot toward the heel of the stocking to thereby place the toe closure in a position such that it could be accommodated even though effected by a sewn seam. These efforts by Getaz

proved fruitful and resulted in his filing on December 1, 1954, an application for patent which issued as Getaz Patent 2,740,279, of which reissue Patent No. 24,314 is involved in the suit against Lemco Hosiery Mills, Inc., Civil Action C–148–G–60. The Getaz development has been limited in any commercial application to the field of seamless, circular knit ladies' hosiery.

We conclude that the Getaz Reissue Patent in suit is valid. It constitutes invention by a true technical genius. It is new to the art and is not a construction that was obvious to one possessing ordinary skill in the art before the issuance of the patent. We do not understand the defendants to contend seriously that there is anything in the prior art teaching that anticipates it, nor do the defendants seriously contend that it lacks invention. Rather, defendants raise other objections that do not deal directly with the merits of the Getaz process itself, (such as defendants' contentions relating to the alleged misuse of their patent monopoly, which is dealt with hereafter).[1] The Getaz Reissue has enjoyed marked commercial success and has been described as creating a "true revolution" in the industry in the field of seamless, circular knit *ladies* hosiery. We conclude that the patent is valid.

We also conclude that the Getaz Reissue Patent has been infringed by the defendant, Lemco Hosiery Mill, Inc. Even though the defendant, Lemco Hosiery Mill, Inc., had as of the date of inspection by representatives of the plaintiffs on January 25, 1963, ceased operations constituting infringement of the claims in suit, i. e., claims 7, 8, 11 and 12 of Reissue Patent No. 24,314, the defendant, Lemco Hosiery Mill, Inc., is equipped with machinery for the manufacture of circular knit seamless hosiery which with only slight modification would enable the defendant to resume the practice of a method infringing claims 7 and 8 of the Reissue Patent No. 24,314 in suit and thus produce ladies' hose infringing claims 11 and 12 of the Getaz Reissue Patent No. 24,314 in suit. The plaintiffs are therefore entitled to the entry of an injunction and an accounting of damages for past infringement as against the defendant Lemco Hosiery Mill, Inc. The other defendants are not concerned with this particular patent.

## LEDWELL AND SLANE PATENTS

These two patents may profitably be discussed together. We are of the opinion that both must be declared invalid for the same primal fault—a lack of invention.

The Ledwell patent came about in this manner. In April, 1956, Goley Marlette, an employee of Adams-Millis Corporation, came upon the issuance in the Official Gazette of U. S. Patent No. 2,740,279 to James L. Getaz discussed above. He pointed this out to T. Lynwood Smith, general counsel and vice president of Adams-Millis Corporation. Smith sought out Getaz suggesting a joint promotion of the Getaz patent and offering the facilities of Adams-Millis Corporation which manufactured both ladies' hosiery and men's and children's half-hose. Negotiations between the parties led to the execution of an agreement whereby Adams-Millis Corporation acquired an

---

1. Defendants also contend that the Getaz Reissue Patent in suit includes claims for different invention than Original Getaz Patent. The Reissue Patent substitutes the words "one or more" for the word "few". This has the practical effect, defendants contend, of disclosing a "goreless" toe fabric while the original claims depend on the formation of gores to produce the resulting toe configuration. We think this argument is without merit. The original claims were unnecessarily limited. The Reissue validly extended them without presenting another invention. Furthermore, under Title 35, United States Code, Section 252, provides the invalidity of a new claim does not impair the validity of an original claim which is repeated and separately stated in the reissued patent. It does not help defendants to prove that claims not in issue were invalid for different invention in the reissued patent.

interest in the newly issued Getaz patent (PX–11(a)) (F–31).

It was necessary for Adams-Millis to convert a standard circular knitting machine in order to produce the type of stocking or sock disclosed in the Getaz patent. Marlette was sent to Palmyra, New York, to examine a half-hose machine which had been converted by Getaz. While there, he obtained socks which had the longitudinal toe opening and returned to Adams-Millis with these for the purpose of having the longitudinal toe closures sewed. The work of actually closing these toes was delegated to James W. Ledwell, an employee of Adams-Millis Corporation, in charge of its looping department. Ledwell undertook to sew toe closures on these socks using a 60–UD Merrow single needle overedge sewing machine. He was unable to secure a satisfactory toe closure. As a result of his inability to secure a satisfactory seam, he contacted Smith and Marlette (the former being in charge of the Getaz-type hosiery program) and requested that Smith ascertain if there was a machine on the market which could make a satisfactory seam.

Acting on Ledwell's request, Smith contacted sewing machine representatives, asking them to come by Adams-Millis plant. In response to this request, Lane C. Burris of Merrow Machine Company, Herrod of Union Special, and Griffin of Singer Sewing Machine Company came to Adams-Millis plant on or about March 12, 1957 (F–36). After explaining what he desired, Smith was told by each of these representatives that their respective companies had a sewing machine which would produce a much better seam than anything Ledwell had been able to accomplish.

Following the initial interviews with these representatives, Adams-Millis Corporation sent substantial quantities of hosiery, both ladies' stockings and men's half-hose of Getaz-type construction to the several sewing machine companies to be seamed. Merrow Machine Company, through Lane Burris, a technically skilled sewing machine salesman for Merrow's distributor, Hollister-Moreland Company of South Carolina, worked very closely with Adams-Millis during this period.

While Smith of Adams-Millis was sending hosiery to be closed to the sewing machine manufacturers, he received from Getaz on June 25, 1957, a stocking in which the toe had been sewed closely transversely along the looper line with a two-needle, three-thread sewing machine, using 70 stitches per lineal inch of fabric for each of the two needles. This stocking had been toe closed at Merrow Machine Company for Van Raalte, hosiery producer, on an M4D–45 machine developed at Merrow for the purpose of sewing hosiery toe closures. Upon observing the seams made by this machine, Smith agreed to meet with Getaz in New York and to contact Van Raalte with Getaz.

On July 18, 1957, while in Merrow's New York office, Smith placed an order by telephone to Merrow Machine Company in Hartford, Connecticut, for an M4D–45 sewing machine to be sent to Adams-Millis. On August 12, the M4D–45 Merrow sewing machine arrived at Adams-Millis. On August 14, 1957, it was set up and placed in operation by Lane Burris, who set the cutters, selected the yarn, adjusted the tension, threaded the needles, and "sewed-off" or tested the machine by sewing toe closures.

Sometime during the day of August 15, 1957, Ledwell sewed toes closed on the M4D–45 sewing machine. The socks which he used had been knit in the usual manner on a circular knitting machine to form the usual transverse toe opening; they were handled by feeding them into the sewing machines in the same manner in which transverse toe openings had been presented to sewing machine for sewing toe closures for many years; no change was made by Ledwell in the setup or operation of the M4D–45 machine; he used the same knife setting, the same stitch forming eccentrics, the same yarn, the same needle plate, the same chaining finger, and the same yarn tension con-

trol as were on the machine when it was shipped from Merrow Machine Company and set up by Lane Burris at the Adams-Millis plant. Ledwell made no change of any nature in the machine at the time he sewed the toe closures transversely along the looper line on August 15, 1957. This was the first time Ledwell had ever seen hosiery which had been toe closed on a two-needle, three-thread, overedge sewing machine. As Ledwell expressed it, in speaking of the M4D–45 machine, and the seam it produced on this occasion: "I did what it did."

Upon observing the socks which had been sewed on the M4D–45 Merrow machine, Ledwell took them to Smith, indicating that he felt he had something new and that it should be patented. Almost one year later, a patent application was filed based on a sock sewed by Ledwell on this occasion on August 15, 1957.

The defendants have sustained the burden of proof resting on them on the issue of obviousness of the invention of the Ledwell patent to one skilled in the art. Ledwell's own testimony on cross-examination makes its clear, we think, that he made no real contribution to the construction of the seam which he produced on the socks identified as DX–24.[2]

2. "Q. Mr. Ledwell, did you consider the stock* you delivered to Mr. Marlette and
   * "DX–24.
Mr. Smith on or before August 15, 1957, to represent your invention?
"A. Yes Sir.
"Q. And you thought that this was something new by way of the seam?
"A. Yes, that is right.
"Q. However, you used a sock which was actually knit in the same conventional manner on a knitting machine and sewed the toe closed on that sock, is that right?
"A. Yes.
"Q. And actually the sock was closed transversely of the toe as it had been done previously either by looping or by a single needle machine?
"A. No.
"Q. And the sewing machine had been designed to seam hosiery closed at the toe portion?
"A. Yes.
"Q. It was a two needle and one looper yarn?
"A. Yes.
"Q. Or two needle yarns and one looper yarn?
"A. Yes.
"Q. And that machine had been set up by Mr. Burris as indicated by his report card?
"A. Yes.
"Q. And you made no changes in the machine at the time you sewed your first closed transverse seam of the toe on August 15, 1957?
"A. That is right.
"Q. And you feed the sock into the machine in the same usual manner that it was fed to the machine on a 60–UD machine for example?
"A. Yes, that is correct.

"Q. And the closure was formed in the manner in which the machine was designed to close it?
"A. Yes. * * *
"Q. What did you contribute to the construction of the seam that has been called the Ledwell seam?
"A. Well, to my knowledge I done something I never had seen done before.
"Q. What was that?
"A. I produced a type of seam that never had been produced on anything that I ever heard tell of before. It was the nearest thing to looping that I had ever seen, it was comfortable to the foot and we caught the stitches, there was no runs and we found it did not have a bulky seam, and to my knowledge I felt that that was something that has never been produced on anything that I had tried or heard anything about.
"Q. And that was the very thing the machine had been designed for, was it? It has been delivered to you for that very purpose was it?
"A. I don't know what the machine was designed for.
"Q. When Mr. Burris came, you were told that it was for sewing hosiery toes closed, were you?
"A. Yes, I don't know if he told me that or not.
"Q. Well, that is what he came in there to instruct you to do, to show you how to sew hosiery toes closed?
"A. Yes.
"Q. And that is in fact what the machine did?
"A. Yes."
Ledwell, pp. 512–515.
"Q. Now when you closed the toe of a hose using the 60–UD machine, there were freely extending loops, were there

■ The Ledwell patent is invalid under the principle that the inherent operation or mere function of a machine is not patentable as a method or process. Smith v. Nichols, 21 Wall 112, 88 U.S. 112, 22 L.Ed. 566 (1874); Risdon Iron and Locomotive Works v. Medart, 158 U.S. 68, 15 S.Ct. 745, 39 L.Ed. 899 (1895); Triumph Hosiery Mills, Inc., v. Alamance Industries Inc., 299 F.2d 793 (CA–4 1962) (Cert. denied). The toe closing obtained by Ledwell was due solely to improved machinery. What he accomplished was inherent in the Merrow Machine Company's M4D–45 machine. Anyone else would have obtained the same inevitable result which was the function of the M4D–45 machine as it had been set up in Ledwell's department by Burris. "A man cannot have a patent for the function or abstract effect of the machine, but only for the machine which produces it." Corning v. Burden, 15 How. 252, 56 U.S. 252, 14 L.Ed. 683. Ledwell obtained the obvious result on a machine sold for the purpose for which it was used. He made no adjustments or changes on the machine. In short, the Merrow Machine Company piloted the ship; Ledwell only started the motor.

■ Adams-Millis Corporation was one of the first hosiery manufacturers to obtain and use the M4D–45 machine, and to sell hose sewed on it. It ran the risk of customer rejection by going into large-scale production of hose sewed in this manner at an early date. Adams-Millis may be complimented on its business acumen and aggressiveness in doing so, but this is something apart from invention within the meaning of the patent laws. Adams-Millis' inventiveness was

more of a business than a technical and scientific nature. Business acumen is not sufficient to justify the granting of a monopoly under the patent laws. In Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438, 441; the Supreme Court said:

"The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexations accounting for profits made in good faith."

We would not be understood as classifying Adams-Millis or the other plaintiffs as "speculative schemers" in any

not, on the socks that you closed after you had severed the looper "course"
"A. Yes.
"Q. And the needle penetrated the freely extending loops, is that correct?
"A. Yes.
"Q. In the same manner as you have done or described in your patent?
"A. Well, it penetrates the same way but we was not catching all the loops in the 60–UD machine.
"Q. And to do that you had to wait until Merrow came out with a satis-

factory machine which was the M4D–45 machine to accomplish that?
"A. I would not say we had to wait for Merrow, there is other machines that do that besides Merrow.
"Q. But you had to wait until M4D–45 in order to do this same thing?
"A. Well, I did what it did.
"Q. And that is why you were able to actually sew the transverse seam, as you did?
"A. That is right."
Ledwell, pp. 525–526.

sense of the word. Quite the contrary is true. But the above quotation does point out the dangers to the business community which lie in an overly generous interpretation of what constitutes patentable invention. In the instant case, furthermore, should the Ledwell and Slane patents be held valid we would have the anomalous business situation where the owners of patents would be controlling the use of machines, manufactured by others than the patentees, in the field for which the machines were designed.

Plaintiffs contend that Ledwell used the M4D–45 machine for a purpose other than the use for which it was intended and for which it was acquired. Plaintiffs' position is that the machine was acquired to form a fine seam in fine-guage ladies' nylon hose and not for sewing men's hose.

Actually, the idea of replacing looping by sewing was a ground-swell in the hosiery industry at this time. Many hosiery companies were making inquiries of the machine companies concerning this new development at this time. A number of hosiery companies had sewed toes closed on an experimental basis on men's hose. It was inevitable that sewing would soon become an accepted practice, along with looping, in the industry for closing the toes of first quality hose as well as ladies hosiery.

What has been said about the lack of invention in the Ledwell method applies a fortiori to the Slane patent. The con-

ception date of the Slane idea is nebulous. Slane himself is not a technician. He did not know how to use a sewing machine himself, nor is there any specific evidence as to who did sew the first sock embodying the Slane seam, or exactly what was done by such operator to produce it. The Slane seam differs from the Ledwell seam in appearance by being wider and flatter. This apparently was achieved by using a wider chaining finger than Ledwell used. The wider chaining finger was a commercial product of the Merrow Machine Company. Its use would be obvious to one skilled in the art. The Slane method is not the stuff of invention. There is a strong indication, in fact, that the original Slane claims were filed for interference purposes only, that is, that the aim was to defeat the Adams-Millis patent rather than to insist on his own invention. The original claims were very broad and would have covered Ledwell's claims. It was by later amendment to the Slane claims that the concept deriving from the use of a wider chaining finger was developed in more detail.[3]

The lack of invention is sufficient to invalidate both the Ledwell and Slane patents. There are also other reasons why the Slane and Ledwell patents are invalid. These will be mentioned more briefly as they are covered in detail in the Findings of Fact.

There has been much discussion of the term "freely extending loops" as used in the Ledwell patent[4]. Defendants con-

3. Defendants contend that Slane's amended application introduced different invention from the original patent. Defendants contend the amendment introduced a concept deriving from the deep web needle plate. The deep web needle plate was not known to Slane at the time of the filing of his original application. We think that the deep web needle plate was not essential to the Ledwell and Slane inventions under closely controlled conditions but proved of great value in providing some positive control to insure consistent commercial production of the Slane toe closure.

4. The Ledwell claim contains these three pertinent steps: "Then cutting the

margins of the opening so as to provide the opening with opposite edges defined by freely extending knitted loops of knitted material." Then: "And closing the opening by joining the loops of one edge thereof to the loops of the other edge with a seam having at least twice as many stitches per inch as there are loops per inch in each edge of said opening." Finally: "While catching each of said loops with at least two of said stitches." Defendants contend that words "by joining the loops" must be interpreted to mean "joining said freely extending loops."

tend that the term "freely extending loops" defines only the loops of the terminal course which is located in the course along the selvageless edge after the cutting operation has occurred. If this contention is correct it would render the Ledwell patent inoperative, for in the Ledwell seam the terminal loops are not caught. Plaintiffs construe this language as referring to knitted fabric loops residing in any course up to as far as 5, 6, or 7 courses from the cut edge which is formed by the cutting mechanism at the time the toe closure is presented to the sewing machine. Plaintiff's interpretation, however, is not consistent with the terminology in the art (as disclosed in the House patent), nor with the plain language of the patent claims.

In addition, the conduct of the Joint Venture Patent Committee, indicated that the Patent Committee, or at least its attorneys, considered the Ledwell claims to be limited to the terminal loops only. After the Ledwell patent issued on September 15, 1959, the Slane application was amended to explain that in the Slane seam the needle stitches extended deep into the fabric and embraced at last two courses. This was to distinguish it from the Ledwell patent claims which contained the words "freely extending loops" and which were interpreted in the Slane application proceedings as overlapping only one course—the terminal course.[5] On November 20, 1959, the Patent Office rejected all of the claims of the Slane application. On January 29, 1960, the Joint Venture Patent Committee purchased the Slane application. The Slane application disclosed nothing else of significance which differed from Ledwell,[6] indicating that the Joint Venture Patent Committee considered the distinction of significance. We think the words "freely extending loops" must be construed to mean the terminal loops or end loops.

The Ledell and Slane patents and claims are also invalid for lack of invention over and anticipation by the prior art. Slane is clearly anticipated by Onderdonk, No. 875,594, as is revealed in the Washburn patent application proceedings. The Washburn application was disallowed on the basis of Onderdonk. The disallowed claims were virtually the same as claims 1, 2 and 4 of Slane. Onderdonk was not cited in the Slane application. It seems clear that the Slane claims 1, 2 and 4 would have been disallowed if Onderdonk had been considered.

The Ledwell patent, even though we have found it inoperative, also anticipates Slane. Plaintiffs have not been successful in distinguishing the "butt type" seam of Ledwell from the "flat abutting" seam of Slane. The distinction appears to be one without a difference. Nor is it a matter of moment to move back one course or more in Slane—this would be well known to one skilled in the art and is a matter only of machine adjustment.

Onderdonk also anticipates Ledwell. The Onderdonk stitch, which is the stitch formed on the M4D–45 machine, is one which will open out flat to form a ridgeless seam, which is the characteristic attributed to the Ledwell concept by the Joint Venture Patent Committee. We think, in short, that the result in Ledwell flowed naturally from the teaching of the prior art. Ledwell's sole step that purports to be new relates to catching each knitted loop with two needle stitches. This is essentially an effort to make an old structure stronger. A single needle stitch will prevent a run. Two needle stitches per loop merely increases the resistance against a run as would three needle stitches per knitted loop. There is no more invention in increasing the number of needle thread stitches per knitted loop to produce increased seam strength and resistance to runs, than there is in using a sewing thread with increased

5. The Examiner stated, in rejecting the Slane claims: "The only difference between applicant's seam and the reference (Ledwell) disclosed the seam as overlapping only one course of the stocking material while applicant's seams overlap two courses of the stocking material."

6. Except a gusset toe which admittedly was of no value.

strength. It would be obvious to one skilled in the art that a stronger seam would result by introducing more needle stitches for each knitted loop. One skilled in the art would know to employ the proper stitch forming eccentrics without having ever learned anything from Ledwell.

## MISUSE OF PATENT MONOPOLY

■ Defendants have urged that each of the patents in suit—including the Getaz patent, which we have held above to be valid—is unenforceable against the defendants by reason of misuse of patents, contending that the Joint Venture Patent Committee are guilty of an unwarranted extension of the patent monopoly by the licensing methods employed. Defendants contend that licensees were compelled to accept a package of patents or not at all. Specifically, they contend that the sale and licensing of the Tronics Trimmer was "tied in" as a part of the Joint Venture licensing programs. That is, they argue that before any licensee could purchase a trimmer, he was required to become a licensee of the Superior Ledwell Toe Closure Method or the Superior Getaz Loopless Toe Closure Method.

We find no evidence of any acts that can be characterized as a patent misuse, nor any withholding of a license under any patent right held for the benefit of the joint venture parties. There is no instance cited, for example, in which a license to use the Tronics Trimmer was requested much less that its use was withheld or conditioned on the taking of a package license. The licenses offered in behalf of the plaintiffs were administered with fairness and were for reasonable and equitable royalties.

Even assuming that conduct amounting to misuse had been established, the Getaz patent would still be enforceable on the theory that such conduct had been abandoned and the consequences of the misuse dissipated. Sylvania Industrial Corporation v. Visking Corporation, 4 Cir., 132 F.2d 947. As a practical matter we find that there has been no actual instance of misuse by the Joint Venture Patent Committee; as a theoretical matter, it could be argued that the licensing program was capable of being misused. However, either during the trial or before trial, the Joint Venture Patent Committee took steps in good faith to eliminate any theoretical basis on which any charge of misuse could be laid.

The defense of misuse is not available, therefore, against the Getaz Reissue Patent which we hold to be valid. The Ledwell and Slane Patents we find to be invalid on other grounds.