**SPERTI PRODUCTS, INC. and the Institutum Divi Thomae Foundation, Plaintiffs,**

v.

**The COCA–COLA COMPANY, Defendant.**

**Civ. A. No. 2700.**

United States District Court
D. Delaware.
Aug. 17, 1967.

John J. DeLuca, DeLuca, Julian & Walsh, Wilmington, Del., for plaintiffs; William Schurtman, Shea, Gallop, Climenko & Gould, New York City, Albert E. Strasser, Melville, Strasser, Foster & Hoffman, Cincinnati, Ohio, of counsel.

Rodney M. Layton, Richards, Layton & Finger, Wilmington, Del., for defendant; Paul L. Ahern, Richard Russell Wolfe, George E. Bullwinkel, Wolfe, Hubbard, Voit & Osann, Chicago, Ill., of counsel.

## OPINION

STEEL, District Judge:

This is a patent infringement action of which the Court has jurisdiction under 28 U.S.C. § 1338.

Plaintiff, The Institutum Divi Thomae Foundation (hereinafter "Foundation") is the owner, and plaintiff, Sperti Products, Inc., originally organized under the name of Sperti Foods, Inc., claims to be the exclusive licensee, of the three patents in suit. The defendant, The Coca-Cola Company, through its wholly owned Minute Maid Division, has produced frozen concentrated orange juice by methods which plaintiffs claim to have infringed the patents. The defenses are invalidity and non-infringement.

*The "Sperti" Patent—U. S. Patent No. 2,588,337, filed April 17, 1950, issued March 11, 1952*

This patent relates to the production of frozen orange juice concentrates adapted to be reconstituted for beverage purposes by the addition of water. The parties have stipulated that only Claims 2 and 3 need be considered, and that the Court's ruling on these claims will be dispositive of the Sperti issues.

The Sperti patent describes in a general way two methods which theretofore had been utilized in preparing orange juice concentrates. In one method, Sperti states, the concentration is achieved by subjecting the fresh juice to evaporation under vacuum at relatively low temperatures to minimize the adverse effect of heat on the taste of the concentrate and of the reconstituted beverage. Under this process, according to Sperti, some "cooked" taste is unavoidable, and the volatile true fruit flavor constituents of the fresh juice are almost totally lost during the evaporation. The second method which Sperti describes comprises concentrating the fresh juice by freezing and then separating the concentrate from the ice, usually by centrifuging, although other methods such as drainage under suction can be used. This method, Sperti states, has the advantage of eliminating the adverse effects of heat on the taste of the concentrate and avoiding the loss of volatile flavor constituents such as occurs during heat vacuum concentration. Under this freeze method practically all volatile flavor constituents are recovered in the concentrate. This method has the disadvantage, however, of inefficiency in that the sugar recovery is low due to the fact that large amounts of soluble solids (mostly sugar) are occluded in the residual ice and can not be recovered without re-processing the ice.

The Sperti patent states that his process preserves the advantages of freeze concentration in that the volatile flavors are retained and the cooked taste is eliminated, and at the same time the loss of soluble solids (i. e., sugar) which adhere to the ice is avoided.

Claim 2 of Sperti describes his process as

"A process of concentrating orange juice to a final product of predetermined desired Brix value and substantially without loss or impairment

of its volatile flavor constituents and soluble solids which comprises

Partially freezing the juice and separating from the ice a concentrate having à Brix value of 20 to 50, the amount of said concentrate being restricted so that its water content is less than that of the desired final product,

separating the remaining soluble solids and liquor from the ice and

evaporating the liquor until the water content of the evaporated residue plus that of said concentrate equals the water content desired in the final product, and then

adding said evaporated residue to said concentrate."

Claim 3 calls for essentially the same series of steps as Claim 2 except that Claim 3 additionally calls for evaporating the sugar-containing liquid to a Brix of 50–80 degrees. (Plaintiffs' Proposed Finding No. 11).

The term Brix is a measure of the solids content of juice or concentrated juice, and in the fruit juice industry a measure in degrees Brix is a practical indication of the percentage of sugar present in the juice being measured.

Defendant contends that Claims 2 and 3 of the Sperti patent are invalid under 35 U.S.C. § 102(b) in that Sperti's claimed invention was patented or described in printed publications in this country more than one year prior to the filing date, April 17, 1950, of the Sperti application.

Defendant relies on the following prior art references to sustain the foregoing defenses:

(i) *Monti* U.S. Patent No. 761,387, issued May 31, 1904;

(ii) *Jackson* U.S. Patent No. 981,860, issued January 17, 1911;

(iii) *Monti* U.S. Patent No. 1,379,470, issued May 24, 1921; and

(iv) Text entitled "Fruit and Vegetable Juices", by Tressler, Joslyn and Marsh, published in 1939 by Avi Publishing Company.

■ A patent is subject to invalidation under Section 102 of the Patent Act only where the invention of the patent is identically disclosed by the prior art. Ling-Temco-Vaught, Inc. v. Kollsman Instrument Corp., 372 F.2d 263, 267 (2d Cir. 1967). None of the prior art which defendant has cited as an anticipation of Sperti meets the exacting requirements of Section 102.

Defendant likewise argues that the Sperti invention as a whole would have been obvious at the time it was made to a person having ordinary skill in the art and hence is invalid under 35 U.S.C. § 103. This section recognizes that a patent may be invalid even though the identical subject matter was not known to the art and hence the conditions of Section 102 can not be met.

In Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) the Court said that § 103 of the Patent Act lends itself to several basic inquiries. It said at 17–18, 86 S.Ct. at 694:

" * * * Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or non-obviousness, these inquiries may have relevancy. * * * "

■ Section 103 enacted in 1952 codified the standard of invention which theretofore existed. Congress hoped by such codification to emphasize "nonobviousness" as an operative test of invention rather than the less definite "invention" language of Hotchkiss v. Greenwood, 11 How. 248, 266, 13 L.Ed. 683 (1850). Under Section 103 the "flash of genius" theory has no place in the

requirement of invention. Graham v. John Deere Co., supra, 383 U.S. at 15, 86 S.Ct. 684; Jones Knitting Corporation v. Morgan, 361 F.2d 451, 457 (3d Cir. 1966). In the latter case the Court pointed out at 457 that under Section 103 it is the end product (result) that matters, and if this product (result) advances the art a single step, there is invention so long as that step is not obvious to those of ordinary skill in the art.

In Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7–8, 55 S.Ct. 928, 79 L.Ed. 163 (1934), referred to with approval in Jones Knitting Corporation v. Morgan, supra, 361 F.2d at 455, the Court stated that the presumptive validity of a patent would not be overcome except by convincing evidence of error and that one who assailed the validity of a patent "bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance."

There can be no doubt that many of the concepts which Sperti utilized in his invention had been a part of the prior art for years before his application was filed. The freezing of juice and centrifuging of the frozen slurry or slush to spin off a concentrate high in soluble solids had been known for about forty-five years. This process, however, was not economically practical because of the loss of soluble solids in the residual ice (R 226). The Jackson patent No. 981,-860 (1911) and the Gore process described in Fruit and Vegetable Juices, by Tressler and Joslyn (1939) (DX 63, p. 361), recognized that soluble solids (mostly sugar) adhered to the residual ice and. that it was desirable to capture these by centrifuging that ice. Gore suggested that the ice be warmed slightly before it was centrifuged. Monti's patent No. 1,379,470 (1921), provided for separating the juice concentrate from the frozen slurry by centrifuging, or by other means not relevantly different, and thereby obtaining a concentrate of 25 degrees Brix, dividing this concentrate into equal parts, and evaporating one part to about 85 degrees Brix, and then mixing the evap-orated part with the unevaporated part to obtain a syrup of about 60 degrees Brix.

It is to be noted, however, that none of the prior art had recognized that the valuable solids which adhered to the residual ice after centrifugal action could be captured by washing or thawing the ice, and then evaporating the resulting liquor to obtain a further concentrate which could be added to the spun off or centrifuged concentrate in such proportions as to produce a blended concentrate with a predetermined desired Brix. This is what the Sperti patent teaches.

In this way Sperti solved the problem of recovering the solids occluded to the residual ice after the frozen slurry had been centrifuged and utilizing them as part of the final concentrate without impairing the flavor of the final concentrate.

Prior to Sperti's invention it had been generally assumed that after centrifuging the frozen slurry, the esters which gave orange juice its characteristic flavor adhered to the residual ice and that if the ice liquor were evaporated by heating, the evaporated concentrate would be unpalatable (R 229). Sperti was the first to discover that the esters were spun off in the centrifuging of the slurry and remained in the residual ice only to a negligible extent.

The evidence of defendant which purports to controvert this fact is not persuasive. It is true, as defendant argues, that Sperti's discovery was nothing more than a fact which was inherent in the centrifuging process itself, and that the centrifuging process was known in the juice concentration art for many years before Sperti's patent. But the discovery by Sperti for the first time that no appreciable quantity of esters remained in the residual ice provided him with a reason for teaching that the liquor resulting from washing or thawing the ice could be vacuum evaporated, and that the concentrate derived therefrom could be mixed with the spun off concentrate without adversely affecting the taste of the resulting product.

Furthermore, it is true, as defendant points out, that the absence of the esters in the residual ice would have been obvious to anyone who vacuum evaporated the ice liquor and tasted the resultant concentrate. By this simple procedure anyone could have discovered the falsity of the prevailing assumption that the residual ice contained the orange flavoring esters, and that evaporating the residual ice liquor would result in an unpalatable concentrate. But the fact is that the scientists who had been working in the juice concentrate field for a number of years had never done this. These were persons having, not ordinary skill, but extraordinary skill, in the art.

The Sperti patent filled a long felt need in that it made the production of the orange juice concentrate more economical than it had been in the past without deterioration in the flavor. The patent was no paper patent. Although it was never used by itself commercially (R 188), the Claim 2 process was used in conjunction with the process disclosed in the Walker patent both in Deland, Florida and later in a very large plant in Salerno, Italy (R 181).

The defendant has a heavy burden of establishing that the Sperti patent would have been obvious to a person having ordinary skill in the juice concentrate field in view of the existing prior art. Defendant has failed to carry this burden.

[5] The Sperti patent is valid.

Defendant quite properly asserts that to prove infringement of the Sperti patent at either the defendant's Plymouth or Leesburg plants, plaintiffs must prove two things. One, defendant directed the wash liquor to an evaporator, and two, added the evaporated wash liquor back to the freeze concentrate.

Plaintiffs concede that the general practice at Plymouth was for defendant to send wash liquor to the freezer feed tanks, but assert that on at least several occasions defendant sent wash liquor to the evaporators. PX 45, 46, 47, 94, 95 and the three entries on PX 96 (being log books maintained by the operators at the Plymouth plant) provide the documentary basis for plaintiffs' contention. Defendant claims that only PX 45 and 96 support that contention. It argues that these admitted deviations by defendant from its normal practice were occasioned because of a breakdown of equipment, and that the quantities of wash liquor involved were de minimis.[1]

As to the other log entries which plaintiffs rely upon, defendant asserts that plaintiffs have quoted them out of context or improperly introduced them as exhibits after the trial had closed, and that in any event they merely reveal suggestions or directions that the wash liquor be sent to the evaporators, but fail to establish that the suggestions or orders were followed. It is unnecessary to rule upon the validity of defendant's contentions or the significance of the two instances as to which defendant admits that wash liquor was sent to the evaporators.

This is because plaintiffs have failed to establish that if defendant in its manufacturing process at Plymouth did direct wash liquor to an evaporator, evidence is lacking that the evaporated wash liquor was combined with the centrifuged frozen concentrate in order to make a final product. Plaintiffs' argument that the freeze concentrate and the evaporated wash liquor were combined is based solely upon defendant's answers to plaintiffs' interrogatories, PX 4 ¶ 11 (a) (8). This answer does not support the plaintiffs' contention. It states that (1) a freeze concentrate was obtained by defendant by passing the frozen juice through a Baker-Perkins Continuous Centrifuge where a concentrated juice of about 28 degrees Brix was collected

---

1. PX 45 discloses that 100 gallons of wash liquor were sent to the evaporators on December 23, 1960; and PX 96 reveals that on December 19, 1960, 2,800 gallons, on February 11, 1961, 300 gallons, and on February 23, 1962, 800 gallons of wash liquor were sent to the evaporators.

in a product tank; (2) the 28 degrees Brix product was blended with high Brix concentrate made by evaporation of "whole juice", and (3) the blended product (about 42 degrees Brix) was canned.

By this answer defendant has admitted that the evaporative concentrate was made by evaporating "whole juice". Presumably this means orange juice before processing. On the other hand, the base of the evaporative ingredient called for by Sperti was the liquor which resulted from the washing and thawing of the ice after the frozen concentrate had been spun off. Sperti claims that he discovered and made use of the fact that the orange tasting esters had been spun off in the frozen concentrate, thereby making it practical to create a second concentrate by evaporating the wash liquor. This fundamental element of Sperti's discovery was not used by defendant at Plymouth when the second concentrate was made by evaporating "whole juice" as defendant's answer to plaintiffs' interrogatory states to be the fact. Hence, plaintiffs have failed to bear the burden of proving that infringement of the Sperti patent took place at defendant's Plymouth plant.

For the same reason the plaintiffs' claim that defendant's process at its Leesburg plant infringed the Sperti patent must be denied.

While defendant claims that the normal practice at Leesburg was not to send the wash liquor to the evaporators, it admits that for experimental purposes during a period of one week, defendant departed from its normal practice and did pump wash liquor to the evaporator. Plaintiffs contend that the record establishes that this activity was more extensive than defendant has admitted. It is not necessary to pass upon this question. This is because plaintiffs have again failed to prove that defendant added the evaporated wash liquor to the freeze concentrate. To establish that it was so added, plaintiffs rely solely upon defendant's answer to plaintiffs' interrogatory 12(a) (5) (PX 5). It provides:

"The liquid product, at about 28 degrees Brix [resulting from the centrifuge operation], was collected and blended with a high Brix evaporator product, and ultimately canned."

The "high Brix evaporator product" does not necessarily refer to the concentrate obtained from the evaporation of the wash liquor. So that whether the wash liquor was evaporated, and if it was, whether the evaporative concentrate was added to the frozen concentrate to produce the final product, remains an open question. Defendant did not have the burden of explaining the meaning of its answer to plaintiffs' interrogatory 12(a) (5). This was plaintiffs' burden and it has not been borne. The addition of the evaporated wash liquor to the centrifuge concentrate was an essential element of both Claims 2 and 3. If an accused process omits a recited element of a claim, without the substitution of an equivalent, the claim is not infringed. Russel Grader Mfg. Co. v. F. B. Zeig Mfg. Co., 259 F. 575, 577 (6th Cir. 1919).

*The "Walker" Patent—U. S. Patent No. 3,156,571, filed February 21, 1955, issued November 10, 1964*

By stipulation of the parties it was agreed that for purposes of this litigation rulings on Claims 1, 4 and 8 as to validity and infringement will be dispositive of plaintiffs' action based upon Walker.

The principal object of Walker's invention, as stated in the patent, is to provide a process and an apparatus for making low cost liquid concentrates in a controlled, continuous fashion with high productivity. The Walker system has been characterized as a balanced system.

It is not necessary to consider the validity of the Walker patent nor whether the equipment of Minute Maid at Plymouth and Leesburg, if used, would infringe it. Plaintiffs admit that the record fails to establish any past infringement of Walker by defendant at either plant after the patent issued on November 10, 1964. The freeze operation at Plymouth had closed in June of 1963 and that at Leesburg had terminated in June

of 1964. Nonetheless, plaintiffs point out that the freeze plants have not been abandoned or dismantled, that they could be put back in operation without any great difficulty, and that the equipment at Plymouth and Leesburg each cost between a million and two million dollars. From this paintiffs argue that the equipment in the plants represents a real and present danger that operations will take place in the future at Plymouth, Leesburg or elsewhere, which will infringe the Walker patent.

The plaintiffs emphasize that the Walker process is not limited to producing an orange juice concentrate but can be employed in the manufacture of other beverage concentrates, such as coffee which Minute Maid is interested in manufacturing. Plaintiffs note particularly an exchange in correspondence between top officers of Minute Maid and Coca-Cola concerning the use of the concentrate equipment at Plymouth for the purpose of making a coffee concentrate, and the supplying of surplus equipment to Minute Maid's frozen coffee division (PX 33, 33A). This correspondence took place in December 1961 and January 1962, almost three years before the Walker patent was issued. It is too remote to be significant, especially since so far as appears it was never implemented by any overt act by defendant.

A letter dated November 9, 1964 between executives of Union Carbide [2] suggests that a lease-purchase arrangement be entered into by Union Carbide with Coca-Cola for specified equipment relating to the freeze concentrate system installed at Minute Maid's plant at Plymouth, and stated that this equipment would serve as a pilot plant suitable for Coca-Cola's proposed coffee concentrate experiments (PX 76). There is no evidence that the suggestion was ever communicated to or followed by Coca-Cola.

None of the evidence which plaintiffs have cited demonstrates a real and present danger, or reasonable likelihood, that defendant proposes to take action in derogation of plaintiffs' rights under the Walker patent.

None of the cases cited by plaintiffs, Matthews v. Allen, 182 F.2d 824 (4th Cir. 1950), DeLong v. Lemco Hosiery Mills, Inc., 223 F.Supp. 1001 (M.D.N.C.1963), Eversharp, Inc. v. Fisher Pen Co., Inc., 204 F.Supp. 649 (N.D.Ill.1961), Farval Corp. v. Republic Steel Corp., 82 F.Supp. 31 (N.D.Ohio 1948), aff'd, 179 F.2d 719 (6th Cir. 1949), cert. denied, 339 U.S. 938, 70 S.Ct. 673, 94 L.Ed. 1355 (1950), are relevant. All involved injunctions against future infringement where the patents involved had been actually infringed in the past but the infringement had been discontinued prior to the suit. Here, there has never been any infringement. In these circumstances Aluminum Extrusion Co. v. Soule Steel Co., 260 F. Supp. 221, 225 (C.D.Cal.1966), refused to issue an injunction against future infringement, saying:

"A past infringement may well indicate a sufficient threat of future infringement, but we have no past infringement in the case before us."

A case might possibly be postulated in which, even though there had been no past infringement, the likelihood of future infringement was so clear that an injunction against its occurrence would be justified. The record in the instant case affords no basis for the application of any such principle.

It has been said that even though a District Court determines that a patent is not infringed, the better practice is to determine the validity of the patent. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644 (1944). This expression was evoked in an action in which a claim of infringement of a patent was made. Here plaintiffs admit that there has been no infringement. Under these circumstances any consideration of the validity of the Walker patent would be a labor of love, and would be unnecessary and un-

2. Union Carbide is the licensor of the freeze concentrative process used by defendant at Leesburg and Plymouth.

productive for purposes of the present action, particularly as proof is lacking of a probability of future infringement by defendant.

Plaintiffs have failed to establish any basis for an injunction.

*The "Cole" Patent—U. S. Patent No. 2,967,778 filed August 20, 1957, issued January 10, 1961*

This patent was issued jointly to Cole, Walker and Reed, but for convenience is referred to as the "Cole" patent.

The patent states that the invention relates to the manufacture of concentrated juices which may be stored under appropriate conditions, shipped to a point of use, and there reconstituted by the addition of water so as to provide a beverage product of normal strength and high flavor. The specifications refer to the process taught by the Sperti patent No. 2,588,337 and to the procedure and apparatus taught in Walker's copending application which eventuated in the Walker patent No. 3,156,571.

Dr. Tressler, plaintiffs' expert, testified that the Walker patent added to the Sperti teachings and that the Cole patent built upon both the Sperti and Walker teachings (R 268). The parties have agreed that for the purposes of the present litigation the Court's rulings on Claims 4, 5, 6, 7 and 8 of the Cole patent will be dispositive of the issues of its validity and infringement.

The Cole invention, as described in Claim 4, contemplates the initial freezing of the beverage liquid to form a pumpable slurry in the manner disclosed in the copending Walker application. From this slurry two concentrates are formed in the following manner: The slurry is continuously fed to a centrifuge where the slurry is centrifuged to separate the ice crystals from the liquid constituent of the slurry and thus produce a spun off or first concentrate. The remaining ice crystals, while still under centrifugal conditions are then subjected to a single washing with an aqueous liquid. The aqueous liquid has a substantially lower Brix value than the first concentrate. The ice crystals are washed at a temperature below freezing and the aqueous liquid with which they are washed is at a temperature above freezing. The quantity of aqueous liquid used is so proportioned as to provide the second concentrate with a Brix value closely approximating the Brix value of the first concentrate, and the ice residue which remains after the washing has substantially no Brix value.

Claim 5 of Cole limits the process described in Claim 4 to orange juice.

The first defense asserted by defendant is that the claimed invention of Cole was patented or described in printed publications in this country more than one year prior to Cole's filing date of August 20, 1957 and hence the alleged invention is not patentable under Section 102(b). The related, although not identical, defense of invalidity for obviousness under Section 103 is likewise urged by defendant.

The concept of using wash water to recover the valuable sugar solids that adhere to the ice after centrifuging was not new. Sperti had suggested it. Nor is there anything novel about washing the ice a single time during the centrifugal operation. This had been recognized in Bedford patent No. 2,354,633 which issued on July 25, 1944 (DX 10). It refers to "one or more washings of the ice mass", states that "[t]he number of washings is, however, immaterial to the invention", and that "[t]he centrifuge may be operated while the ice mass is being sprayed". While Bedford disclosed washing with dilute juices, the Cole patent likewise states that the washing may be done with water, fresh juice or diluted juice.

Bedford states that the duration of the washing period is to be determined as a matter of judgment on the part of the operator. This would seem to be obvious. Other factors being equal, the longer the washing, the less will be the solids which adhere to the remaining ice. But, as the washing period increases the Brix of the ice liquor resulting from the wash will necessarily decrease because

of the added dilution. Judgment must determine the extensiveness of the washing so as to produce a minimum of loss of solids which adhere to the residual ice consistent with achieving the desired Brix of the concentrate resulting from the washing.

■ Plaintiffs decry the significance of Bedford. This is in large part because Bedford fails to embody that part of Cole's patent which embodies the Walker process. However, for purposes of obviousness under Section 103 the co-pending Walker application which was filed prior to the Cole application was part of the prior art even though the issuance of Walker postdated Cole. Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965), rehearing denied 382 U.S. 1000, 86 S.Ct. 527, 15 L.Ed.2d 489.

Dr. Tressler, plaintiffs' expert, testified that perhaps the most important part of the Cole patent is the washing of the ice crystals with a definite limited amount of water, or in some instances orange juice, with the centrifuge basket at a temperature somewhat below freezing (R 250). At R 254 Dr. Tressler testified that the washing with the limited amount of water was not known and would not have been obvious to a skilled worker in the art on August 20, 1957 when the Cole application was filed (R 255). He stated that none of the experimenters working in the field envisaged such results, that he had worked on the manuscript of Fruit and Vegetable Juices which he and Professor Joslyn had published in 1939 (DX 63), and on the manuscript of Freezing Preservation of Foods which he and Clifford F. Evers had published in 1957 (DX 62), and that in doing so he (Dr. Tressler) had collected every single patent and article in the field relating to concentration of fruit juices. He stated that if there had been anything even akin to the Cole invention he would have been aware of it (R 256). Dr. Tressler admitted on cross examination that in the book published in 1957 he had made no reference to the 1944 Bedford patent. As previously indicated, Bedford disclosed substantially what Dr. Tressler had characterized as "perhaps the most important part" of the Cole patent. So that Dr. Tressler's testimony as to the unobviousness of these claims of Cole is entitled to little weight.

Furthermore, as early as 1950 centrifuge manufacturers were equipping their centrifuges with built in wash water lines and timing devices for limiting the amount of water used for rinsing purposes. Commercial equipment was therefore available long before Cole's application for performing a rinsing operation in connection with a centrifugal operation which was an important part of Cole's patent (DX 21 and 23).

An article by Frank K. Lawler from "Food Engineering" published in October 1951, refers to a process for producing an orange juice concentrate. It states that after ice-juice slush has reached the point where no more freezing occurs in the freezing tank, the slush is conveyed to a Sharpless centrifuge to separate the ice crystals from the juice. It continues (DX 19, p. 70):

"To insure complete juice removal, the ice is rinsed in the centrifuge with water at 34–36 deg. F."

Dr. Tressler, in Freezing Preservation of Foods (1957), refers to the process described by Lawler and in paraphrasing the process states: "After separation, the ice is rinsed in the centrifuge with a small amount of 34° F. water." (DX 62, p. 608).

In short, when the Cole application was filed the Bedford patent and the Lawler article were available to the public. The co-pending Walker application was part of the prior art and its teachings were actually referred to in the Cole specifications.[3] Commercial centrifuges on the market permitted the rinsing of

---

3. As stated, what has been referred to as the Cole patent was jointly applied for by Cole, Walker and Reed.

ice crystals during centrifugal operation of an ice-juice slurry and were equipped to control the amount of water used in the rinsing process. The Cole process as described in Claims 4 and 5 would have been obvious to one skilled in the art and hence these claims are invalid under Section 103.

Claim 6 embodies the same process described in Claim 4 but adds that the Brix value of the orange juice which is frozen into a slurry is first adjusted to a Brix value of substantially 12 to 15 degrees by the addition of the concentrates referred to in Claim 4 and mixtures thereof.

Claim 7 embodies the same process described in Claim 5 (actually that described in Claim 4 but limited to orange juice) but includes the additional step of blending the first concentrate with an evaporative concentrate formed from orange juice from which a portion at least of the second concentrate is added to the orange juice used for the formation of the evaporative concentrate.

Since Claims 4 and 5 upon which 6 and 7 are dependent are invalid there is no basis upon which the validity of the latter claims can be sustained. Claim 6 provides merely for increasing the Brix of the feed juice to substantially 12 degrees to 15 degrees [4] by "sweetening" the feed juice with a concentrate or mixture of concentrates derived from the process of Claim 4. This was another feature of the patent which Dr. Tressler stated was "unique", unknown to the art, and unobvious at the time when Cole's application was filed (R 251, 255). Little significance can be attached to this testimony since the Meinzer patent No. 2,187,572 (DX 8) which was issued on January 16, 1940, was not mentioned in Freezing Preservation of Foods which Dr. Tressler and Evers had published in 1957. Meinzer not only taught that after the centrifuging of a frozen juice, the remaining ice crystals could be washed with small quantities of ice water to remove adhering concentrates, but he also taught that to produce the highest degree of concentration the wash liquor should be added to the next batch of juice to be frozen. It is only in this latter respect that Claim 6 differs from Claim 4.

According to the Cole patent, the purpose of "sweetening" the feed juice called for by Claim 6 is to obtain a pumpable slurry which will not freeze too soon and which will prevent the formation of ice crystals which are so fine as to create difficulty in the centrifuging. That a feed juice having a Brix of 12 to 15 degrees would be best suited to achieve these results could readily be ascertained by anyone skilled in the art by trial and error of a limited kind and thus would have been obvious to such a person.

Claim 7 in general suffers from the same infirmity as Claim 6. The addition which it (Claim 7) makes to Claim 5 would have been obvious to one skilled in the art. The added step of blending the first concentrate derived from the Claim 5 process with an evaporated concentrate formed from orange juice is what Sperti taught. The idea of adding a portion at least of the second concentrate produced under the Claim 5 process to the orange juice used for the evaporative concentrate is nothing more than a method of "sweetening" the latter, and is but a minor and obvious variation of what Sperti had previously taught. Anyone attempting to increase the degree of concentration of the evaporate could well have conceived the idea.

The process contemplated by Claim 8 is substantially the same as that in Claim 5 except that Claim 8 states that the second concentrate derived through the utilization of the Claim 5 process contains most of the pectins resident in the orange juice. Claim 8 provides for heating the second concentrate to stabilize the pectins.

Dr. Tressler defined a pectin as a colloidal material which causes marmalades, preserves, etc. to jell. He said that when

---

4. The Cole patent states that the Brix value of natural orange juice is variable and ranges roughly from 10 degrees to 13 degrees.

orange juice concentrate was first marketed difficulty was encountered when the frozen concentrate was stored for longer than about three months, particularly if the temperature was not well below zero. Under these circumstances, Dr. Tressler said, when the concentrate was emptied into cold water and stirred it would not go into solution but would maintain its jelly like form which was completely unsatisfactory. Dr. Tressler testified that the problem was submitted to biochemists, who indicated that the solution was relatively simple, and that to avoid the jelling it was only necessary to destroy certain enzymes that caused the pectins to jell. Dr. Tressler said there were many ways of destroying the enzymes but that "the simplest way is simply to heat the orange juice prior to its concentration". He said that "when that was done, then the orange juice concentrate, regardless of its concentration, could be frozen and stored indefinitely without jelling". (R 547–549).

The clear implication of Dr. Tressler's testimony is that the destruction of the enzymes in the pectins by heating the juice was well known in the art long before the Cole application was filed and was obvious to anyone having skill in the orange juice concentrate field.

The fact that the Bedford patent was cited against Cole in the Patent Office has not been overlooked. Admittedly this enhances the presumption of validity of Claims 4 and 5 which arose when the patent was issued. But the circumstance is not of controlling significance. The standard of inventiveness employed by the Patent Office is far below that applied by the Courts. S. W. Farber, Inc. v. Texas Instruments, Inc., 344 F.2d 957 (3d Cir. 1965), cert. denied, 382 U.S. 843, 86 S.Ct. 82, 15 L.Ed.2d 84 (1965).

Furthermore, the Meinzer patent was not cited against Cole in the Patent Office. This tends to weaken the Patent Office presumption of validity.

Defendant has presented convincing evidence and has met the heavy burden of persuasion required of it to establish that the Cole patent is invalid for obviousness under Section 103.

The foregoing constitutes the findings of fact and conclusions of law required by Rule 52(a).

The complaint will be dismissed.